STATE v. ALFRED DANIELS.

(Filed March 8, 1904).

1. JURY—*Grand Jury—Challenges—The Code, secs. 1722, 1725, 1741—Quashal.*

There is sufficient evidence in this case upon which to base the findings of fact of the trial judge, and upon such findings the motion to quash the indictment on account of alleged discrimination against the negro race in revising the jury list was properly overruled.

2. JURY—*Indictment—Taxation—Grand Jury.*

The irregularity in the county commissioners failing to make the prepayment of taxes a qualification for persons on the jury list, though the subject of censure, is not ground for quashing an indictment found by a grand jury drawn therefrom.

3. CONFESSIONS—*Admissions—Evidence.*

In this prosecution for homicide the statement of the accused as to the killing, not being induced by threats or promises, is admissible.

4. EVIDENCE—*Homicide—Tracks.*

The evidence of footprints near the scene of the crime is admissible in a prosecution for murder, though it is not shown that accused made tracks at the time similar to those found.

5. ARGUMENT OF COUNSEL—*Evidence—Homicide.*

The argument of counsel for the state, in this prosecution for murder, that the accused waylaid the deceased is justified by the evidence.

134——41

INDICTMENT against Alfred Daniels, heard by *Judge Frederick Moore* and a jury, at Fall Term, 1903, of the Superior Court of LENOIR County. From a verdict of murder in the first degree, and judgment thereon; the defendant appealed.

*Robert D. Gilmer, Attorney-General,* and *A. D. Ward,* for the State.
*J. C. L. Harris,* for the prisoner.

CONNOR, J. The prisoner was charged with the murder of F. G. Simmons, and in apt time filed a plea in abatement and moved the Court to quash the indictment for that:

1. The list of thirty-six jurors drawn by the County Commissioners of Jones County, from which the grand jury was drawn, and which found the bill of indictment, was revised with partiality, unjustly and purposely against competent persons of the negro race, to which the prisoner belongs, on account of the race or color of such persons.

The officers whose duty it was to revise the jury lists and to draw the panel to be summoned, from which the grand and petit juries were drawn for the present term of the Court, at which the indictment was found against the prisoner, with the unlawful and avowed purpose of discriminating against persons of the negro race, excluded the persons who of right, being competent, should not have been excluded from the jury lists; that such unjust and unlawful discrimination against the prisoner deprives him of a fair and impartial trial in this Court, as is guaranteed to him under the Constitution of North Carolina and the Thirteenth and Fourteenth Amendments to the Constitution of the United States and the Acts of Congress; that there are in Jones County about seven thousand persons, more than one-third of whom are of the negro race, who pay taxes on more than thirty

thousand dollars worth of property, a large number of whom are equal to the average citizen of said county. In accordance with the request of the prisoner, the Court caused *subpœnas duces tecum* to issue to the chairman of the board of commissioners, the register of deeds ( *ex officio* clerk to the board) and the Sheriff of the county, commanding them to bring their several records into Court, and also the jury boxes, etc. The motion to quash was founded upon the affidavit of the prisoner. The Court, after hearing the testimony offered in support of the motion, found the following facts: The jury box contains the names of four hundred and thirty persons. It does not appear, and the Court is unable to find, whether any of said persons are negroes. There are five hundred and twenty-eight colored males residing in Jones County over twenty-one years of age who had paid their taxes for the year 1902 prior to June 1, 1903. There are as many white males over twenty-one years of age and upwards residing in said county whose names are not in the jury box as there are colored males of the same age whose names are not in said box. The jury boxes were revised on the first Monday in June, 1903, as required by law—the commissioners taking the tax books or lists for the preceding year, and selecting from said tax books or lists the names of such persons as they thought were competent and morally fit to sit on the jury, and placing the names thus selected in the jury box. In selecting the names to be placed in the jury box the commissioners did not think of or discuss the race question. They considered only the question of competency and fitness. They did not make the payment of taxes a prerequisite. They discussed the qualification of various negroes and white men, and rejected their names when they decided they were not competent and fit. The only test which was applied was capacity and fitness of persons whose names appeared on the tax list. The com-

missioners at their regular meeting in September, 1903, before the commission of the alleged offense for which the prisoner is indicted, drew from the jury boxes of the county the names of thirty-six persons to serve as jurors at this term of the Court. They were drawn in the manner required by law. The thirty-six persons whose names were so drawn and were summoned to serve as jurors at this term of the Court were all white persons. The grand jury was regularly drawn from the thirty-six jurors drawn and summoned as above set forth. It appeared from an examination of the said grand jurors, before they were empaneled, that each of said grand jurors had paid his tax for the year 1902. The total population of Jones County is 8,239, of which 4,479 are whites and 3,760 are colored. The prisoner is a negro. Upon the foregoing findings of fact the motion to quash the bill of indictment is overruled, and the defendant excepted, assigning as cause thereof:

1. That the Court erred in not finding that none of the names contained in the jury boxes are the names of negroes.

2. That the Court should, from the evidence, have found that the test was not honestly applied, and that negroes or persons of the colored race were unjustly excluded on account of race and color.

3. That there is no evidence upon which to base the findings.

The prisoner was thereupon arraigned and pleaded not guilty. From a judgment pronounced upon a verdict of guilty of murder in the first degree he appealed.

The prisoner, by his motion to quash the indictment for the causes set forth, evidently intended to present the question passed upon by this Court in *State v. Peoples*, 131 N. C., 784. In accordance with the ruling in that case his Honor granted to the prisoner a *subpœna duces tecum* for the chairman of the board of commissioners, with the jury box, and

such other witnesses as the prisoner desired to examine. Counsel for the prisoner in this Court conceded that there was nothing in the statutes prescribing the qualification of grand or petit jurors or the mode of selecting them, conflicting with the Constitution of the United States or the amendments thereto. His Honor finds that, "in selecting the names to be placed in the jury box, the commissioners did not think of or discuss the race question. They considered only the question of competency and fitness. They did not make the payment of taxes a prerequisite, they discussed the qualifications of various negroes and white men, and rejected their names when they decided they were not competent or fit." In *Carter v. Texas,* 177 U. S., 442, the defendant, in apt time and by a proper motion, alleged that all persons of the colored race, etc., were excluded from the jury list "on the ground of their race and color, etc." He offered to introduce witnesses and requested the Court to permit him to do so to sustain the allegation. The Court declined to hear any testimony in support of the motion and overruled the same. The Supreme Court of the United States, reversing the Texas Court, held that, upon the allegations made in the motion, the defendant had been denied a right duly set up and claimed under the Constitution of the United States. This ruling was followed by this Court in *State v. Peoples, supra.* His Honor, in strict conformity with these authorities, granted the subpœnas, heard the testimony, and found the facts in regard to the manner of making up the jury lists as set out in the record. The prisoner's counsel properly conceded that upon the record it does not appear that the prisoner has been denied any right secured to him by the Federal Constitution. He insisted, however, that upon the findings of the Court it appears that the commissioners have failed to comply with the statutes regarding the manner of making up the jury list from which the grand

and petit jurors were drawn. He says: "According to section 1724 of The Code the jury list must contain the names of all the inhabitants who are qualified as provided in section 1722 to serve as jurors; and if the list as made out by the clerk of the board of commissioners does not contain all the inhabitants, the commissioners are required to insert the names of such persons or inhabitants in the jury list; that section 1725 provides that the commissioners, after the jury list has been laid before them by the clerk, shall diligently enquire whether any person qualified to serve as a juror has been omitted, and if so to insert his name and strike off such as were not qualified"; that the commissioners violated section 1722 by making competency and fitness the qualification instead of obeying the requirements of that section; that the number of jurors whose names are in the box being less than one-third of the voting population of the county, and the further fact that there are 528 negro males twenty-one years of age who had paid their taxes, that there are as many white males over twenty-one years of age residing in Jones County as there are colored males of the same age whose names were not in the jury box, "emphasizes the fact that the commissioners did not revise the jury list, but made a selection of the persons whom they desired to serve as jurors, and that there were gross irregularities in making up the the jury list." * * * He insists that upon these facts found by the Judge, his motion to quash the indictment should have been allowed.

We do not care to place the disposition of this case upon the fact that the contention made in this Court is different from and foreign to that made in the Court below. The prisoner made his motion in apt time, and in accordance with the provisions of section 1741 of The Code. If, upon the facts found, there be any legal ground for quashing the indictment we should not hesitate to grant the motion,

although such grounds be different from those assigned in the
Superior Court. Any suggestion made pursuant to the
rules of practice prescribed, either by statute or the procedure
prevailing in the Courts, involving the integrity of the jury
lists or the manner in which the law in respect to making up
such lists has been executed, is entitled to the respectful and
careful consideration of the Court. It affects not only the
honor of the State, but the lives, liberties and property of
the citizens. "At common law no such thing was known
as the preparation of a list of persons who were liable to be
summoned to serve as jurors at a succeeding term of the
Court, but the uncontrolled discretion was vested in the
Sheriff, in the Coroner, or in officials called *elisors,* of sum-
moning such 'good and lawful men' as they might choose
under the command of the writ of *venire facias.* This led
to enormous abuses, chiefly in the packing of juries and
the blackmailing of citizens, to remedy which American
statutes have generally provided, with more or less particu-
larity, for the preparation a given time before the commence-
ment of any term of Court, or at other stated periods, of a
list of persons within the county or other jurisdiction from
whom jurors are to be summoned." Thompson on Trials,
section 13. In accordance with this policy of the law there
has been in force in this State, from the earliest period of
our history, statutes prescribing the mode of making the
jury lists from which the jurors to serve at each term of the
Court shall be selected by drawing the names thereof, from
a box provided for that purpose, by a child not more than
ten years of age. The law in this respect is set forth in
chapter 39 of The Code, the only change since the adoption
of The Code being that the time at which the jury lists shall
be revised is the first Monday in June instead of September.
It is made the duty of the commissioners at the time stated,
in each year, to cause their clerks to lay before them the tax

returns of the preceding year for their county, from which they shall proceed to select the names of such persons only as have paid their taxes for the preceding year, and are of good moral character and sufficient intelligence. The names thus selected shall constitute the jury list. This list shall be revised once every two years on the first Monday in June, and the names of all inhabitants qualified to serve who may not be of said list shall be added thereto. The commissioners are further required to carefully examine the list as already made out, compare the same with the tax reurns and diligently inquire whether any persons qualified to be jurors as provided are omitted, and whether any persons not qualified have been inserted and to strike such names from the list. In these four sections is comprised the entire legislation on this subject in force in this State; the remaining sections of the chapter are directed to the manner of drawing from the list thus prepared the jurors to be summoned to attend upon the succeeding term of the Court. It has been held from the earliest period of our judicial history that the provisions of these statutes are directory, and not mandatory. *State v. Seaborn,* 15 N. C., 305. In *State v. Haywood,* 73 N. C., 437, *Bynum, J.,* says: "The facts are that the jury list, from which the grand jury finding the indictment was drawn, contained the names of 451 qualified jurors, but did not contain the names of 241 others who were also qualified and ought regularly to have been on the list, but were omitted therefrom by the county commissioners in preparing and revising the jury list, from some cause not appearing and not alleged to have been intentional or corrupt. Was the indictment well found? is the question. There is no allegation that any of the jurors comprising the grand jury were not properly qualified jurors and were not properly on the list drawn from, or that they were not in every other respect regularly drawn and im-

paneled in the manner prescribed by law." The learned Justice further says: "It is highly conducive to the fair and impartial administration of justice that these details should be strictly observed and followed, and any intentional non-observance of them is the subject of censure, if not of punishment. But it is well settled that they are only rules and regulations, which are *directory* only, and have never been held to be *mandatory* where the persons summoned are qualified jurors in other respects." *State v. Martin,* 82 N. C., 672; *State v. Smarr,* 121 N. C., 669. The record in this case does not show that any persons qualified to serve upon the jury as jurors were excluded from the list. The argument that such is the case is based upon the facts found by the Judge in respect to the number of inhabitants in the county, and the number of persons who had paid their taxes. There is no evidence and no finding that persons of good moral character or of sufficient intelligence residing in the county were omitted from the jury list. The duty of passing upon the qualifications of the inhabitants of the county in this respect is imposed upon the commissioners, and in the absence of any finding that they failed to discharge such duty or exercise good faith in doing so, their conclusion is final and not subject to review. If, however, it be conceded that such persons were omitted from the jury list, it seems to be well settled, both in this country and in England, that this would not be a ground to quash the indictment. In the celebrated case of *O'Connell and others v. The Queen,* 11 C. & Fin., 155, it was held by the House of Lords, after a most able and exhaustive discussion, that a challenge to the array in the Court of Queen's Bench, alleging that the jurors' book had not' been completed in conformity to the Act of Parliament, in that the names of a number of persons qualified to act as jurors had been fraudulently omitted from the general list from which the book

was made up, for the purpose of prejudicing the defendants, could not be sustained. From this judgment *Lord Denman,* in a masterly opinion, dissented. We are not called upon in this case to adopt the law as therein laid down, as there is no evidence or finding that there was any fraudulent omission of the names of persons from the list. We do not understand the American authorities upon this subject to approve the doctrine to the extent held in O'Connell's case. The extent to which they go is thus stated in Thompson on Trials, sec. 33: "Statutes which prescribe the manner of selecting by county, town, or other officers, the general list of persons liable to jury duty from which the panel is drawn, are generally treated as directory merely. It is, hence, a general rule that irregularities in the discharge of this duty constitute no ground for challenging an array. If the jurors who have been selected and drawn are individually qualified, that is generally deemed sufficient." In *People v. Jewett,* 3 Wendell, 314, *Savage, C. J.,* says: "By the act directing the mode of selecting grand jurors, passed in 1827, the duty of making the selection is conferred upon the supervisors of the several counties of the State. They are required to select such men only as they shall know, or have good reason to believe, to be possessed of the necessary property qualification to sit as petit jurors; to be men of approved integrity, of fair character, of sound judgment and well-informed. Thus the qualifications of the grand jurors are defined by statute, and if those selected possessed the required qualifications there can be no objection to the array. * * * A grand jury should be selected with a single eye to the qualifications pointed out by the statute, without inquiry whether the individuals selected do or do not belong to any particular society, sect or denomination, social, benevolent, political or religious." The learned Chief Justice says: "But if they did thus err, the array cannot

STATE *v.* ALFRED DANIELS.

for that purpose be challenged. While those who are selected are unexceptionable, the fact that others equally unexceptionable are excluded is no cause of challenge of the array. A challenge can be supported only by showing that the persons selected are not qualified according to the requirements of the statute."

In this case his Honor expressly finds that the grand jurors were examined before they were empaneled, and that each of them had paid his taxes for the year 1902. There is no suggestion that in any other respect they were not qualified in accordance with the statute. The jury list was revised several months before the commission of the homicide for which the prisoner is indicted. While we cannot approve the course pursued by the commissioners in failing to make the payment of taxes a prerequisite, as required by the Act, it having been found that the grand jurors were qualified in this respect, we can see no reason for quashing the indictment upon that ground. It is to be regretted that those who are commissioned to perform this important duty in the administration of public justice should fail to observe the clear and unmistakable requirements of the statute. In *Moore v. Guano Co.,* 130 N. C., 229, it appeared that there were gross irregularities in drawing the jury from the box, which this Court held constituted good cause for challenge to the array. The conclusion to which we arrive in this case does not conflict with what is there said. We have carefully examined the several grounds set out by the prisoner in his motion to quash the indictment for alleged irregularities in making the list, and find no error in his Honor's refusal to grant the motion. The law secures to him, as to every other citizen of the State, without regard to race, color or other condition, the right to a fair and impartial grand jury, composed of the inhabitants of the county qualified to serve as jurors. This, upon the

finding of the Court below, he has had, and he·has no just cause of complaint.

We find in the record no other objection to the petit jury, either by way of challenge to the array or to the poll.

We proceed to pass upon the exceptions made to his Honor's rulings on the trial. The testimony tended to show that the deceased was shot upon his own land, a short distance from the ·river low grounds; that he was last seen early in the morning of the day of the homicide going into the woods; that about 9 o'clock a witness, introduced by the State, heard two guns fire down the river, and after the last firing heard some one "holler." The deceased was seventy-seven or seventy-eight years old. The body was found on the day following the disappearance of the deceased about one hundred and fifty yards from the road; it was lying on side; his gun was· about ten steps from him and had not been discharged; shells looked as if they had been in the gun three or four weeks; the woods where the body was found were right thick; one could not see the deceased from where he was found to the river; the leaves were disturbed somewhat; shot in the front, six wounds just over the heart, ranged slightly up. There was evidence tending to show that the prisoner crossed the river on the morning that the deceased was missing; that he made a paddle of cypress boards; he had a gun with him; the paddle was found near the river and identified as being the same one that the prisoner had made. One witness testified that "on the morning the deceased was found, several persons took a boat, went up the river and looked at the bank, found that a boat had landed right off against where they found the body, the bank looked like some one had slipped in; saw two tracks made by some foot measuring eight or nine shoe, sole of left shoe was cut and left there, and there was an impression where the man go up and got in a boat; tracks went up to

where the body was found, almost straight from where the boat landed. The witness got into a boat and saw a boat, which in the morning had been a little down the river, on the opposite side of the river; went across and landed and saw tracks where a man had got out; a paddle was in the sunken boat; a chain was thrown around the cypress knee, but not fastened; tracks on each side of the river were the same, sometimes walking and other times running; followed the tracks up to the fields." The witness described the course of the tracks. One witness testified that he was with the prisoner in the woods some time before the homicide. The prisoner went to the house and got a gun and shot a squirrel and hid the squirrel under bushes; asked him why he did that; he said that Ed. Cox was as damned a rascal as Furney Simmons (the deceased), and that he would be out there directly; said that Simmons would come into the woods and get after him for shooting; said that he wished F. G. Simmons would run on him one time, and he would give him his dose and leave him there. Olen Simmons was the son of the deceased. This was in 1901. There was testimony to the effect that the prisoner had bought shells about two weeks before the homicide; they had No. 4 shot in them. There was evidence of some conversation between the prisoner and other persons in regard to hunting on posted land, and that the land of the deceased had been posted. The prisoner said frequently that he was going to hunt upon the land of the deceased if he had to kill him. One witness swore that he saw the prisoner about sunrise on the day of the homicide; that he said he was going towards Quaker Bridge and down by the side of the river and kill some squirrels. There was much other evidence of the same character, to which no exception was made.

The prisoner was carried to the jail of Craven County. When brought back to Jones County in custody of the

sheriff he got off the train and saw a big crowd of colored "camp-meeting" people, and seemed to be scared. About half way between Core Creek, where he left the train, and Trenton, he made a statement. No one besides the sheriff, Will Barker, and the witness were with him. The prisoner said: "Do not let them hurt me." Sheriff Taylor said: "No one shall hurt you"; said that he would sit beside the prisoner, and if they shot they would hit both. The witness Brogden asked the prisoner how it was. He said he was coming up the river and Mr. Simmons beckoned to him to come across the river. He said when he got up to the bank the deceased told him to stop, that he was close enough. The deceased said that he was tired of these negroes and white people hunting on his land, and that he was going to shoot him. The deceased threw up his gun to shoot him, and that he, the prisoner, began to "holler"; that the deceased took his gun down to cock it, and he shot him; that he then went across the river. The witness then asked him if the tracks found were his, and he said "No," that he was in the boat on the river when he shot the deceased, and the deceased was on the bank; that he was coming up the river. To all of this the prisoner objected and excepted to its admission. This witness further testified that he went to where the body was found, that the banks were about six feet high and the bushes were thick, and it could not be seen by one on the river; would have to be on the bank; he saw where the boat had landed, saw the track which looked like a man had jumped down hill and slid; did not see any tracks above there on the hill; the body was in the woods when he got there; no shots in the arm; butt of the gun was towards the river; if the deceased was pointing the gun towards the prisoner, the muzzle would have fallen toward the river. We find no error in his Honor's ruling in admitting this testimony. No threats were made. There is no suggestion

that the crowd of people made any demonstration or did anything to put the prisoner in fear.

The prisoner objected to testimony in regard to the tracks because no comparisons were made, and no similarity of tracks shown other than that they were made by an eight or nine shoe. It is well settled that evidence in regard to tracks is of little value, unless it is shown that the person charged with the crime made tracks at the time similar to those found at or near the place of the crime. They are competent, however, in connection with other testimony, and entitled to such weight as the jury may give them.

The prisoner excepted because his Honor allowed the State's counsel to argue at length that the prisoner waylaid the deceased, whereas there was no evidence to support his argument. We are of the opinion that there was no error in that respect. We find no exceptions to his Honor's charge in the record. We have carefully examined the testimony and the entire record and find no error therein.

The question as to the prisoner's guilt depended entirely upon the finding of the jury as to the truth of the testimony and the conclusions to be drawn therefrom. Upon a careful consideration of the entire record we think there is

No error.