Error.

STATE v. J. H. HODGE.

(Filed December 18, 1906).

*Homicide—Witnesses Separated and Sent Out of Court-room—Refusal to Permit Witness to Testify—Practice.*

In an indictment for murder, where the Court upon motion of the prisoner's counsel made an order that all the witnesses should be sent out of the court-room and separated, the refusal to allow a witness for the prisoner to testify, who was kept in the court-room contrary to the order of the Court and without its knowledge, is not ground for a new trial, where counsel merely stated that the witness's testimony was material, but did not state to the Court below nor to this Court in what particular it was material, or what he expected to prove by the witness.

CONNOR and WALKER, JJ., dissenting.

INDICTMENT for murder against John H. Hodge, heard by *Judge G. S. Ferguson* and a jury, at the May Term, 1906, of the Superior Court of DURHAM.

From a verdict of guilty of murder in the first degree, and sentence thereon, the prisoner appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*Guthrie & Guthrie* and *Bramham & Brawley* for the prisoner.

CLARK, C. J. The prisoner was convicted in May last of the murder of his wife, on 24 February, 1906. The evidence was plenary. He came to the house of his wife between 11 and 12

o'clock at night, when she was in bed, as were her six children, the youngest five years old, four of them girls, and the oldest a girl about 17, and all sleeping in the same room. The oldest boy testified that he was waked up between 11 and 12 o'clock by his father's voice, who upbraided his mother about a deed he had made her for the property. When she refused to discuss the matter he ran to the bedside and attacked her in the presence of her children, who tried to shield her and to hold him back, but in vain. He threatened to shoot them, and when the terrified children relaxed their hold and were run out of the house by him, he dragged his wife out of bed and shot her. This boy was just 15 years old. The prisoner had beaten his wife before, and had been put under a peace bond. A neighbor who heard the screams and pistol shot, hurried over to the house, when the prisoner, who was standing in the room where his wife lay shot and dying, met him in the hallway, and, pointing his pistol at witness' head, told him not to come in. The children were all out in the yard in their night-clothes, screaming. The witness went to get an officer, and when he got back the prisoner had fled. The dead body of prisoner's wife, with the bed-clothes wrapped around her waist, was then lying with her head on the hearth and feet on the floor. She had been shot in the side. The prisoner rode in a street car to the vicinity of his wife's house, got off and went in that direction, and soon the pistol shot was heard. Several testified that if the prisoner was then under the influence of liquor it was not perceptible; he seemed sober. After the homicide his employer, Mr. Houston, went to see him, told him he was sorry he had gotten into this trouble, and asked him "why he had done as he did. He said he had been treated wrong. I asked him if he was drinking. He said no, he had drunk nothing before he went there, but something after he left. I then asked if he was not sorry for what he had done. He said no, that he was glad of it, and that he had been treated wrong: his property had been taken from him

and he had been kicked out of doors; that he had studied over the matter and planned it for some time." The same witness saw him again and asked, in the presence of the jailer, "if he regretted what he had done. He said no, that he was glad of it; that he had been treated wrong, his property had been taken from him, that he had been kicked out of his own house and that he could not stand it any longer." When asked if he was not afraid he might be hung, he said "he didn't care, and was ready to pay the penalty; that he hoped they would hang him; that he was ready to hang then." When the coroner went to see the prisoner he looked up and asked: "Is she dead?" When told she was, he said: "Then I am satisfied." W. T. Riggsbee, who was with the coroner, cautioned him to keep silent, that he would regret it, but he replied that "he would not, and that he had thought over the matter for five weeks." When asked when he got the pistol, he said a few days ago, and when asked if it was not since Thursday (the homicide was on Saturday night), he said "Yes"—said he got the pistol from a friend, but when asked the name of his friend, said he had forgotten.

· Mr. Hamlet testified that about 10 o'clock the night of the homicide he saw the prisoner buy a pistol, who asked if the pistol would "shoot strong." When told that it would, he said he "would try it next day, and if it did not shoot strong he would bring it back."

The oldest daughter, aged 17 years, testified substantially to the same state of facts as her brother; that they were all asleep in the same room, she and one of her sisters in bed with her mother, when she was awakened by the prisoner's voice; he was standing in the floor, and told his wife to get up, that he "wanted to talk with her." He again told her to get up and said: "I am going to live in this house in spite of you and Lawyer Manning." He again told her to get up. She told him she was sick and to get away, she could not stand to talk to him. He was then sitting upon the side of

the bed; he immediately pulled his pistol out and said: "You can't stand it? See if you can stand this."

The witness tried to get between the pistol and her mother's head, when the prisoner told her to "Get up, or I will shoot you," whereupon the prisoner took hold of his wife's feet, jerked her out of bed and dragged her to the hearth. When his daughter started to them, prisoner pushed her to the door and then, with his wife in one of his arms, shot her in the side. She said her younger sister offered to fix her father a place to lie down, when they first woke up; he declined and said: "I wouldn't lay down in this house five minutes for $1,000." She says that before she went to bed she fastened all the doors, except the back door, which her mother said that she had fastened.

The prisoner and his wife had separated and were not living together. The sole evidence introduced for prisoner was that of some witnesses who testified that he was drinking on his way to his wife's house that night. The only exception to be considered (for though there were others, they were merely formal and are without merit, and though not expressly abandoned, are not in the brief) is the following, as stated by the Judge: "The prisoner, when the jury were impaneled, through his counsel, moved that witnesses be sent out and separated. The motion was granted. The State's witnesses were sworn and sent out of the court-room, and the witnesses were also sworn for the prisoner and sent out of the court-room. On the first day of the trial prisoner's counsel talked with the witness, W. T. Riggsbee, and learned of his testimony, but did not put him under subpoena until to-day, second day of the trial. Both before and after the witness was subpoenaed, counsel for prisoner permitted the witness to stay in the court-room, without having him sworn or calling the Court's attention to the matter, until they called him to the stand. The State objected to the witness; objection sustained; and prisoner excepted."

The Court adds: "The foregoing facts were found at the time the witness (Riggsbee) was offered, upon statement of counsel then made, who stated that he had examined said Riggsbee on the first day and knew what his testimony would be, but did not put him under subpœna till the morning of the second day, and both before and after he was put under subpœna he permitted Riggsbee to remain in the court-room without calling the attention of the Court to the fact; counsel for the prisoner stated that the witness' testimony was material, but did not state to the Court *in what particular it was material or what he expected to prove* by said witness, and the objection was to the ruling of the Court in declining to allow the prisoner's counsel to examine the witness Riggsbee."

This was a mere abstract proposition, and could not be held error unless the prisoner had made known what the evidence would be. Had that been stated, and had been in anywise material, there can be no doubt the learned and just Judge who tried this case would have admitted it, notwithstanding the conduct of counsel and the undue advantage which might have been given the defense by permitting this witness to remain in the court-room during the whole trial in contempt of the order of the Court made at the instance of the defense, by which all witnesses were sent out of the court-room. At any rate, if counsel had stated what he expected to prove, the question would be presented whether the defense had suffered any prejudice. It is elementary learning that the appellant must show error that prejudiced him. For all we know, the witness Riggsbee would not have given any evidence, the exclusion of which could be of any effect. Neither below, nor in this Court even, did the defense give the slightest inkling by affidavit or even a statement what it would be. He did not present it in either Court. The mere assertion that excluded evidence is material is not sufficient. The prisoner may be mistaken about it, and if so, its exclu-

STATE *v.* J. H. HODGE.

sion, even though erroneous, is not reversible error. For that reason courts have always held that the excluded evidence must be material, and whether it is material or not is a question of law which must be decided by the Court and not by the bare suggestion of the prisoner, or his counsel. In all the evidence Riggsbee appears only once, and then not at the scene of the homicide, but at one of three confessions, and if we should surmise (for we do not know) that he would materially contradict the coroner's account of the confession made to him, there are the other two fuller confessions, not offered to be contradicted, at which Riggsbee was not present. This doubtless accounts for the Court not being told what his evidence was.

The crime of which the prisoner has been convicted, and of which the above is a condensed synopsis, was proven in all its fullness of detail. The prisoner, living separated from his wife, had a grievance about property; he buys a pistol, inquiring if it will "shoot strong," goes down to her house near midnight, effects a burglarious entrance, rouses her with her children, attacks her, and when her little children try to shelter her, drive them out of the house by flourishing his pistol, drags his wife out of bed by the heels, holds her in his left arm and shoots her, drives a neighbor off at the muzzle of his pistol, and escapes. When taken he asks, "Is she dead?" and when told that she is, replies: "Then I am satisfied." On at least three different occasions he confesses the crime and declares that he does not regret it, and that he had contemplated it for five weeks. The only evidence offered in defense is to contradict the witnesses for the State who testified that the prisoner seemed entirely sober when on his fatal errand. There is not even the usual attempt to prove insanity, nor anything tending to suggest it. We are asked to give a new trial, not for any material evidence excluded, but because the defense states that there was material evidence excluded—and that by a witness who was kept in the court-

room contrary to the order of the Court, and without the knowledge of the Court. To grant such motion would seem trifling with justice. The evidence must be set forth before we can hold that it was material, and therefore that its exclusion was prejudicial. In an indictment for homicide in Massachusetts it was held, upon similar facts, that the exclusion of the witness was in the discretion of the Court, though there the evidence was disclosed. *Commonwealth v. Crowley,* 168 Mass., 121; and same was held in *State v. Gesell,* 124 Mo., 531; Whart. Cr. Ev. (9 Ed.), 446; Greenl. Ev. (16 Ed.), 432c; *Holder v. United States,* 150 U. S., 91; *O'Bryan v. Allen,* 95 Mo., 75; *Jackson v. State,* 14 Ind., 327; *Bell v. State,* 44 Ala., 393; *Bird v. State,* 50 Ga., 589.

The conviction of the guilty and their punishment is commanded by the law. The Constitution guarantees security of life and person. This guarantee is a mockery if crime is not punished, for unless the punishment of crime deters from its commission, criminal courts with their heavy expense and consumption of time should be abolished. The sole object of a trial for murder is not the acquittal of the prisoner. It is to determine whether he is guilty or not, after giving him the advantage of requiring the unanimous verdict of a jury of twelve men, each of whom must be satisfied beyond a reasonable doubt of his guilt. There is no doubt here of the commission of the crime, of its revolting details, of the base motive, of the preparation for it, of the thinking over it, of the confessions of the prisoner. The mere assertion that a witness could have given material evidence, the purport of which was undisclosed below, and on the hearing here, cannot justify a new trial.

The prisoner has been fairly tried and convicted. He gave his wife no postponement and no opportunity of defense, omitting no circumstance of horror. The law has given him nearly a year's delay, opportunity of defense, the aid of counsel, and his conviction, after a full hearing, has been de-

clared by the verdict of twelve men, beyond a reasonable doubt of his guilt—and, indeed, the evidence permits of none. The evidence of the crime and the attendant horrors are beyond denial. None was attempted. There was the fullest evidence of premeditation—his going with a pistol to the house where slept his defenseless wife and children, the burglarious entrance, the threat and then the assault with a pistol, the breaking down the feeble but zealous protection of the children, who sought to protect their mother with their own bodies, the terrifying the children and driving them out, dragging his wife by the heels out of the bed, holding her up on one arm while he shot her with the other, the shooting without provocation or excuse—all this shows a deliberate purpose to kill. Besides, there was the previous declaration, when buying the pistol, and three voluntary confessions of having determined on the matter long before and his gratification at accomplishing his purpose.

Riggsbee was not present at the scene of the murder, nor at the buying of the pistol, and only at one of the confessions, the least important one, that made to the coroner. The defense has not vouchsafed to lay before the courts what Riggsbee would have said, but it is clear that it could not have called in question the circumstances of the homicide and the premeditation of the prisoner. He can still lay it before the Executive. He has been "informed of the accusation against him, has confronted his accusers and witnesses with other testimony, and has had counsel for his defense." Const., Art. I, sec. 11. It is not a restriction of the above rights to require, in the discretion of the Court and in the interest of justice, the regulation of the order in which witnesses shall be examined, that they shall be sworn or that they shall be sworn and sent out of the court-room before being examined. It has been a long-observed practice in the administration of justice, and on this occasion the motion was made by the prisoner. His failure to observe the order called for

such steps as were necessary to enforce it. He has not, however, shown that any testimony excluded would have been useful to him. With every latitude possible for the prisoner, there is a point beyond which reverence for the administration of justice forbids us to go, lest justice be wounded in the house of her friends.

No Error.

HOKE, J., concurring: I do not think that the Judge below had the right, in his discretion, to deny the examination of the witness.

There are decisions which uphold this ruling. There is also strong authority to the contrary; and I would never agree to the proposition that in a prosecution of this character a prisoner could be deprived of testimony material to his defense because a witness, during the progress of the trial, had entered the court-room in violation of the Judge's order.

Holding this view, however, I think the judgment should be affirmed for the reason that it nowhere appears, nor can it be discovered, that any harm has come to the prisoner by this action of the trial Judge.

This is not a case where a prisoner was without counsel, and may have erred in ignorance of his rights; nor where the witness had refused to disclose the purport of his testimony. On the contrary, the case shows that the prisoner was represented by counsel, faithful, learned and capable, who had examined the witness and claimed to know what his testimony would disclose.

Neither at the trial, nor at any other time, nor in any way, has this testimony been stated in substance or tenor so that the Court can see its materiality. On the contrary, as pointed out in the principal opinion, it appears, and almost conclusively, that if the witness was aware of any relevant fact or circumstance, the evidence was hardly of importance and could not possibly have affected the result.

A perusal of the case leads to the conclusion that the counsel, in the presence of desperate circumstance, was not aggrieved by the denial of a substantial right or the rejection of evidence which he regards as of consequence, but was seeking for an exception upon which he could successfully maintain an appeal.

Such an exception, so presented, is, to my mind, entirely too indefinite and speculative for serious regard in the administration of the practical affairs of life; and to hold it for reversible error would render the enforcement of the criminal law well-nigh impossible.

As said in *Cherry v. Canal Co.*, 140 N. C., 422, quoting from Pl. and Pr., vol. 2, p. 500:

"This system of appeals is founded on public policy, and appellate courts will not encourage litigation by reversing judgments for technical, formal or other objections, which the record shows could not have prejudiced the appellant's rights."

And from *Ashe, J.,* in *Butts v. Screws,* 95 N. C., 215:

"A new trial will not be granted when the action of the trial Judge, even if erroneous, could, by no possibility, injure the appellant."

This sound and salutary principle obtains in criminal as well as in civil causes, and, applied to this case, shows that the trial is free from reversible error.

I am of opinion that the judgment below should be affirmed.

CONNOR, J., dissenting: The testimony, as arrayed in the opinion of the *Chief Justice,* presents a case in which the enormity of the crime and the manifest guilt of the prisoner are well calculated to cause a Judge to hesitate to dissent from the judgment which brings merited punishment to the criminal. It is due to the learned and impartial Judge who tried the case, and I do not hesitate to say that he wisely exercised his discretion in declining to permit the witness

Riggsbee to be sworn, provided it was a matter of discretion and not of absolute right.

I am impressed with the conviction that the conclusion to which the Court has arrived establishes a precedent in our criminal jurisprudence, violative of an essential and a most valuable constitutional right secured to every person charged with crime. I am not inadvertent to the fact that notwithstanding the truth that a frequent recurrence to fundamental principles is essential to the preservation of liberty, we weary and become impatient of constitutional restraints upon government when invoked to secure to guilty persons trial according to "the law of the land." Notwithstanding all of this, I am compelled to dissent from several propositions announced in the opinion of the Court.

The Bill of Rights clearly and unmistakably declares that, "In all criminal prosecutions, every man has the right to be informed of the accusation against him and to confront the accusers and witnesses with other testimony," etc. Without this guaranty to the citizen, when charged with crime, the right of trial by jury would be of no value, but rather a cunningly devised scheme for keeping the promise to the ear and breaking it to the sense.

I cannot think that this right to confront his accusers with testimony is ever dependent upon the discretion of a Judge. The Court should seek to remove the decision of all questions involving the right of the citizen from the realm of discretion and place it upon the foundation of law—fixed, certain, and of universal application. One of the purposes which the people had in making written constitutions was that there should be a government of laws and not of men.

In regard to the question presented by the exception of the prisoner, we have a direct, and, I think, controlling authority in this Court. In *State v. Sparrow,* 7 N. C., 487, the prisoner was upon trial for murder. After the jury was charged, the witnesses for the State and the prisoner "were sworn and

sent out." After the evidence had been closed on the part of
the State and the defendant, the Solicitor-General moved for
leave to swear another witness, who had been present in court
during the whole trial, to prove that the prisoner had fled
from persons who went to arrest him, after the deceased died.
This motion was objected to on the part of the State; but the
objection was overruled by the Court and the witness was
sworn and examined. Prisoner excepted and, upon convic-
tion, appealed.

*Taylor, C. J.,* was of the opinion that the exception was
good, and that there was error in the action of the Court,
entitling the prisoner to a new trial. *Judges Hall* and *Hen-
derson* thought otherwise. The former said: "The Constitu-
tion of the State declares that every man has a right to be
informed of the accusation against him and to confront the
accusers and witnesses with other testimony; and if the pris-
oner, when the proper time comes, has a right to introduce
his witnesses, as the Constitution authorizes him to do, he
would not forfeit that right if, *either through inadvertence or
design,* he or the State omitted to call their witnesses when
directed to do so, in order that they might be separated."

*Henderson, J.,* said: "Whatever may be the consequence
of an omission or refusal to obey the order of the Court to
name or send out the witnesses, I think the Court is not
authorized to reject a witness offered at the proper time, be-
cause he was not sent out. This would add another objec-
tion on the score of incompetency, unknown in our law, as
far as I can discover. For I have never yet heard of a wit-
ness being rejected on that account, and it must be admitted
that this motion is predicated on the supposed existence of
such a rule. Were a prisoner to refuse to name his witnesses
in order that they might be sent out, a Judge would hesitate
much before he would direct a jury to retire without hearing
such witnesses, if offered by the prisoner when called upon to
make his defense and offer his proofs. The law, and the Con-

stitution which gives him a right to confront his accusers with witnesses and other testimony, would be a dead letter."

This case has been cited but once by this Court. Then a witness who was not sent out was examined and the Court held that it was not error. *Worth v. Cox,* 89 N. C., 44.

Judge Elliott, in his work on Evidence, sec. 802, says that while there is some conflict among the authorities whether a witness remaining in the court-room should be permitted to give testimony, it is held in some jurisdictions that "where a party is without fault, and a witness disobeys an order for exclusion, the party ought not to be deprived of the testimony of his witness. This latter view would seem to be the better; that is, if the party calling the witness has been guilty of no misconduct, a Judge ought not to reject him. So then, in case of refusal by, or failure of, a witness to leave the room, the proper remedy would seem to be for the Court to admit his testimony and punish the witness for contempt of Court." Among many other authorities cited to sustain this proposition is *State v. Sparrow, supra.*

In this connection it may be well to note that the case cited in the opinion of *Jackson v. State,* 14 Ind., 327, came under review by the same Court in *State v. Thomas,* 111 Ind., 516, *Judge Elliott* saying: "Where a party is without fault, and a witness disobeys an order directing a separation of witnesses, the party shall not be denied the right of having the witness testify, but the conduct of the witness may go to the jury upon the question of his credibility." Citing Taylor on Evidence. "But it seems to be now settled that the Judge has no right to reject the witness on this ground, however much his wilful disobedience of the order may lessen the value of his evidence." Also citing 2 Phil. Ev., 744, saying: "But it may now be considered as settled that the circumstance of a witness having remained in court in disobedience to an order of withdrawal, is not a ground for rejecting his

evidence, and that it merely affords matter of observation." *Thomas's case* was reaffirmed in *Taylor v. State,* 130 Ind., 66.

I do not think that the cases cited in the opinion sustain the conclusion reached by the Court. In *Holder v. United States,* 150 U. S., 91, the Court directed the witnesses, except the one under examination, "to be excluded from the court-room." Bickford, who had remained in the court-room, was examined without objection; other evidence intervened, and he was recalled, objection then being made for that he had not left the room. The objection was overruled, and defendant excepted. *Fuller, C. J.,* said: "If a witness disobeys the order of withdrawal, while he may be proceeded against for contempt, and his testimony is open to comment to the jury, by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he can not be excluded on that ground merely, although the right to exclude under particular circumstances may be supported as within the sound discretion of the Court. Certainly the action of the Court in admitting the testimony will not, ordinarily, be open to revision." This falls far short of sustaining the right of the Court to exclude a defendant's witness.

In *State v. Gesell,* 124 Mo., 531, an order for separation and withdrawal was made, when the jury was impaneled. The record states: "Furber, who had been a co-defendant and had been severed from him, remained seated by the defendant Gesell in the court-room during the whole trial." The Court says that the authorities are in hopeless conflict as to whether the Court can reject the testimony of a contumacious witness. "The point has been decided both ways in this State," citing cases. The conclusion is reached, on the authority of *O'Bryan v. Allen,* 95 Mo., 68, that "If the party who desired the testimony of the disobedient witness has *participated in his* disobedience or has been guilty of *connivance* at the fault of the witness, he should not be

142—44

allowed to testify." When we turn to *O'Bryan's case,* we find that it was held to be reversible error to exclude a witness who was not sent out "unless the party or his attorney calling the witness has been party or privy to the violation of the order," "because," says the Court, "any other rule would put it in the power of a hostile witness to deprive a party of his evidence."

I respectfully submit that the authorities cited in the opinion in that case should have led the Court to hold that "a witness who disobeys such order is guilty of contempt; but the Judge cannot refuse to hear his evidence, although the circumstance is a matter of remark to the jury." 2 Best Ev., 636. The learned Justice says that this "may now be regarded as settled." In *Commonwealth v. Crowley,* 168 Mass., 121, the circumstances under which the witness was excluded were peculiar. I concede that the ruling in that case sustains the opinion in this.

It is worthy of note, however, that the question was not discussed by the Court, and *Holder's case, supra,* was relied upon. The value of that case as an authority for the purpose of sustaining the right to exclude the witness has been pointed out. Wharton Cr. Ev., sec. 446 (9 Ed.), is relied upon. The original text so states the law, but the note after citing many cases concludes: "But it may now be considered as settled that the circumstance of a witness remaining in court, in disobedience of an order of withdrawal, is not ground for rejecting his evidence." The old rule was always to exclude the testimony.

I have thus reviewed the authorities relied upon to sustain the ruling in this case. It is impracticable for me to comment upon the large number of cases cited in the excellent brief of prisoner's counsel, showing that, by the overwhelming weight of authority, the Court has no right to exclude the witness. The latest work on criminal procedure so states the law. Clark Crim. Proc., 548. The last deliverance of

this Court is to the same effect. In *State v. Hare,* 74 N. C., 591, it is held error to refuse "to allow the defendant to examine a witness who was not present when the other witnesses were sworn and sent out, and who came in during the trial, but had not heard the examination of the other witnesses." No authorities are cited; the question is treated as settled. *Grimes v. Martin,* 10 Iowa, 347; *Dixon v. State,* 39 Ohio St., 73.

I cannot better close the discussion of this question than by quoting the wise and noble words of one who drew inspiration and acquired knowledge by heredity, example and education, of the principles of constitutional liberty from an ancestry illustrating the highest virtues of citizenship and judicial service in our own State. In *Parker v. State,* 67 Md., 329, *Mr. Justice William Sheppard Bryan,* lately departed, after a long and honorable service on the Bench in his adopted State, said: "It was in the discretion of the Court to order the witnesses to leave the court-room; but it is not reasonable to take away from a prisoner on trial the benefit of testimony on which his life may depend, because of the misconduct of another person. The humanity of the law is shocked at the punishment of the innocent. It provides with the greatest solicitude that persons accused of crimes shall have fair and impartial trials. The object is considered of sufficient importance to be guaranteed by the solemn and impressive declarations of our organic law. The scheme and theory of our legal system seek to provide that no man shall be adjudged guilty, unless the truth of the matter charged upon him has been established after a fair and full investigation. The ascertainment of the truth is the great end and object of all the proceedings in a judicial trial. But this object is pursued by general rules which experience has shown to be useful in guarding against erroneous conclusions. By the operation of these general rules, certain well-defined classes of persons are forbidden to testify. Subject to these

STATE *v.* J. H. HODGE.

well-known and distinctly marked exceptions, a person on trial has the right to prove the truth relating to the accusation against him by the evidence of all witnesses who have any knowledge of it. And they are compelled to attend and deliver their testimony in his behalf. Since such great care has been taken to secure the right of an accused person to prove the truth relating to the accusation against him, it would be very strange if he should forfeit this most precious privilege by the misbehavior of a witness. Authorities were cited at the bar for the purpose of showing that in some jurisdictions it was within the discretion of the Judge to refuse to permit a witness to testify under the circumstances stated in the second exception. If the evidence of such witness would show the innocence of a prisoner on trial for his life, then the discretion of the Judge to admit or reject the testimony amounts to a discretion to take the prisoner's life, or to spare it. The wise, just and merciful provisions of our criminal law do not place human life on such an uncertain tenure. A man's life and liberty are protected by fixed rules prescribed by the law of the land, and are not enjoyed at the discretionary forbearance of any tribunal. All suggestions of this kind are alien to the spirit and genius of our jurisprudence." This language was used with the approval of *Justices Alvey, Stone,* and *Miller,* and leaves nothing more to be said.

When the constitutional right to confront his accusers is placed upon positive law, there is certainty and safety to the citizen. When made to depend upon variable and varying circumstances and conditions, ultimately vesting in the unreviewable discretion of a Judge, there is confusion, uncertainty, resulting in conflicting decisions, dependent upon the peculiar views of the Court, respecting the guilt or innocence of the defendant, which it is the province of the jury alone to decide.

We are not called upon to decide in this case whether, if the prisoner were in fault, in not swearing and sending his witness out of the court-room, he would forfeit his constitutional right. There is nothing in the record indicating that he knew that Riggsbee was under subpœna, or would be called. The prisoner had been in jail and was of course in custody during the trial. Whatever may be said of the effect of his personal conduct upon his right, I find no authority holding that by the failure of his counsel to comply with the order of the Court his rights are forfeited. There are rights secured to a person on trial for a felony which he cannot waive, while there are others which may be waived by him, but not by his counsel. I do not find any *decision* holding that the right to examine his witness is lost by any act of omission or commission of counsel. I am sure that, upon principle, no such decision could be sustained. Here there is no suggestion that the learned and honorable counsel connived at or, for any improper reason, permitted the witness to remain in the Court after he ascertained that his testimony would be of value to his client and had him subpœnaed. It is entirely consistent with our observation and experience that he overlooked the fact that the witness should retire. His uniform honorable and frank conduct in his relations to the Courts exclude any other explanation. But it is said that the prisoner has suffered no harm by the refusal of the Court to permit his witness to testify. If I were permitted to express my personal opinion in this respect, I should not dissent from the proposition. When, as a Judge, I am called upon to deal with a constitutional right of a citizen, I am not permitted to make the Constitution of "none effect" because of such reasons. I do not find that the Judges have heretofore done so. I find no case, and none is cited, to show that a Court may for such reason deal with their rights.

Our own reports, and many others, contain numerous cases in which new trials have been given because of the failure to

accord constitutional rights to defendants, and in none of them is it suggested that unless prejudice was shown it was not reversible error.

It is further said that the exception cannot be sustained, because it does not appear what the prisoner proposed to show by the witness. I concede that where the exception is based upon the exclusion of *evidence* such is the rule. The distinction is well stated in *Thomas's case, supra,* where it is said: "The relatrix was not bound to state what she expected to prove by Johnson, because the question is not as to the competency of his testimony, but as to his right to testify at all. Where the matter complained of is the action of the Court, in refusing to permit a witness to testify at all, the grounds of the objection to the witness must be shown by a bill of exceptions, and this is all that need be shown in order to present the matter for our consideration. We cannot say that the relatrix was not prejudiced by the refusal of the Court to permit Johnson to testify, and the judgment cannot be sustained." This opinion is sustained by authority. I do not find in any of the cases which I have examined that the right of defendant to have his exception considered is dependent upon showing what he expected to prove.

I have with some labor and care considered and investigated the question presented because, with all possible deference to the opinion of the Court, both in respect to the law and the desire to see that guilty men are punished, I cannot resist the conclusion that a dangerous innovation, of course unintentional, is being made upon a fundamental right of the citizen. If, perchance, the right is invoked by a guilty man, it is no reason that it should be denied or its value and certainty weakened. We cannot tell how soon it will become a shield for the protection of an innocent man charged with crime. I concede, what I do not find anywhere doubted, "that the sole object of a trial for murder is not the acquittal of the prisoner. It is to determine whether he be guilty or not after

giving him the advantage of requiring the unanimous verdict of a jury of twelve men, each of whom must be satisfied beyond a reasonable doubt of his guilt." I only insist that unless he be permitted to confront his accusers with his witnesses, the right of trial by jury is of little value, and to refuse it to him is, as is said by *Chief Justice Henderson,* to make this provision of the Constitution "a dead letter."

WALKER, J., concurs in the dissenting opinion.

NOTE BY REPORTER.—In this case an application for a writ of error was refused by the Justices of the Supreme Court of the United States on the ground that no Federal question was involved. A similar application was also made and refused by the Court on the same ground, in *State v. Daniels,* 134 N. C., 641.